IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

IN THE MATTER OF THE SEARCH OF: )
)
2322 Sun Valley Circle )
Silver Spring, MD 20906 )
)
501 Hungerford Dr., Apartment 250 )
Rockville, MD 20850 )
)
2612 Kirkwood Place, Apartment 202 )
Hyattsville, MD 20782 )

## AFFIDAVIT

I, Timothy McGrath, being duly sworn, depose and state as follows:

1. I have been a Special Agent of the Drug Enforcement Administration since March of 1995. I have made numerous arrests for violations of the Controlled Substances Act and have conducted numerous search warrants. I have also received training in and am familiar with methods used by drug trafficking and money laundering organizations.

2. I have experience in the investigation of violations of federal and state narcotics laws. I have conducted and participated in numerous narcotics investigations resulting in the arrest and conviction of drug distributors, and seizure of quantities of controlled substances. I have received training from various state and federal agencies including the Drug Enforcement Administration (DEA) in the areas of drug identification, drug distribution methods, money laundering, financial investigations, and drug enforcement techniques. I am familiar with method of use, effects, distribution, appearance, as well as the method of manufacture of controlled substances, including cocaine.

3. This affidavit is submitted in support of an application for search warrants for the following premises:

   a. 2322 Sun Valley Circle, Silver Spring, Maryland is described as a two-story, tan brick townhouse with brown siding/trim. The number 2322 appears to the right of the front door.

   b. 501 Hungerford Drive, Apartment 250, Rockville, Maryland is described as five story brick and stone apartment building with the numbers "501" on the front door over the main entrance. Apartment 250 is further described as having a black door with a silver knocker and the number "250" to the left of the front door.

   c. 2612 Kirkwood Place, Apartment 202, Hyattsville, Maryland is described as a three story, brown brick apartment building. The address "2612 Kirkwood Place" appears on a green awning over the main entrance. Apartment 202 is further described as having a green door with the number "202" at the top of the door.

4. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from state and federal law enforcement officers, and information provided by cooperating witnesses. All observations referenced in this affidavit that were not personally made by me were related to me by the person who made such observations.

5. Based on my experience and training, I am aware that:

   a. Narcotics traffickers often purchase and/or title their assets in the names of relatives, girlfriends, or aliases, or in the names of other individuals known as nominees to avoid detection of these assets by government and law enforcement authorities.

   b. Narcotics traffickers will pay individuals or associates to act as nominees to obtain property to assist them in hiding their assets from law enforcement and government agencies.

c.    That, although these assets are in names other than those of the narcotics traffickers, the traffickers actually own and utilize these assets, and exercise dominion and control over them.

d.    Narcotic traffickers must maintain large amounts of currency on hand in order to maintain and finance their ongoing narcotic business.

e.    It is common for narcotic traffickers to maintain books, records, receipts, notes, ledgers, and computerized files relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. These are maintained where the traffickers have ready access to them and feel most secure.

f.    It is common for drug traffickers to conceal proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities. In order to accomplish this concealment, narcotic traffickers frequently build stash places within their residences or businesses, and at these stash places, traffickers maintain evidence pertaining to their narcotic business, as well as records which reflect the manner in which they conceal narcotic proceeds, including: currency, financial instruments, jewelry, book, records, receipts, bank records and safe deposit box keys. These stash places are frequently maintained by narcotic traffickers within their residences, businesses, the residences of friends and associates, or other locations over which they maintain dominion and control.

g. That narcotics traffickers often utilize electronic equipment such as computers, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described above.

h. That when drug traffickers amass large proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize entities such as domestic and international banks, securities brokers, accountants, casinos, real estate purchases, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency.

i. That the sale of cocaine and other controlled substances generate large quantities of United States Currency in small denominations (commonly referred to as street money).

j. That it is common for drug dealers to physically handle and count the street money after receiving it in exchange for controlled dangerous substances, thereby leaving residue traces of controlled substances on the street money. That law enforcement agencies utilize highly trained canines which react to the scent of controlled dangerous substances and their residue traces, and that those trained canines have reacted to narcotics tainted currency negotiated at banks and concealed in residences of narcotics traffickers.

k. That it is common for drug dealers to separate their street money by denominations and put this currency in stacks in varying thousand dollar increments to facilitate quick counting.

l. That the Internal Revenue Service Form 4789, Currency Transaction Report (CTR), which financial institutions must file with the IRS to record currency transactions which exceed $10,000 causes significant problems for narcotics traffickers when they attempt to negotiate

4

their illegal profits at a financial institution, and that, in order to evade the filing of a CTR, narcotics traffickers often structure their currency transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency.

   m.   That cocaine and/or other narcotics traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization.

   n.   That drug traffickers take, or cause to be taken, photographs of themselves, their associates, their property and their product. That these traffickers usually maintain these photographs in their possession.

   o.   That narcotics traffickers commonly have in their possession, on their persons, at their residences and/or their business, firearms, including, but not limited handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property which may include, but not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and United States Currency.

6. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed or known to the government.

## INVESTIGATION

7. The Drug Enforcement Administration (DEA), Group 32, has been investigating the ongoing drug trafficking enterprise of Gary ROSS, Billy SIMON, Edward PAYNE and others since November 2003. A DEA Confidential Source of Information (CS) indicated that Edward PAYNE

was a mid-level cocaine trafficker operating in Washington, DC and Prince Georges County, Maryland. The CS has assisted DEA for a period of seven years and has never provided DEA with information which has proven to be intentionally false. The CS's information led to the arrest and conviction of four individuals, the purchase or seizure of approximately 600 grams of cocaine or cocaine base, approximately 75 grams of heroin and two firearms.

8. Based on the CS's information, Group 32 arranged a controlled purchase from Edward PAYNE on 11/17/2003. After searching the CS for drugs and other contraband, DEA sent the CS to PAYNE's address located at 2215 14th Street, NE, Washington, DC. Once there, CS purchased 62 grams of crack cocaine from PAYNE for $1800. The crack was later analyzed by Norman Newby at the DEA Mid-Atlantic Laboratory and determined to be 61.3 grams cocaine base, with a purity of 44%.

9. On 12/2/2003 and 12/3/2003, Group 32 arranged another controlled purchase from PAYNE for 62 grams of crack. On 12/3/2003, CS contacted PAYNE on his cellular phone, number (202)285-1384, and agreed to meet PAYNE at his house between 12:25 PM and 1:00 PM to purchase the crack. After being searched for drugs and other contraband, the CS was sent to 2215 14th Street, NE, Washington, DC. Once there, the CS purchased 62 grams of crack for $1,800. In addition, CS observed PAYNE with approximately 125 additional grams of cocaine. The crack was later analyzed by Norman Newby at the DEA Mid-Atlantic Laboratory and determined to be 61.6 grams of crack, with a purity of 80%.

10. On 1/12/2004, Group 32 arranged a third controlled purchase from PAYNE. CS called PAYNE on his cellular phone and ordered a "Big Eight," meaning 125 grams of cocaine. After being searched for drugs and other contraband, the CS went to PAYNE's residence and

purchased approximately 125 grams of cocaine for $3,600. While in the residence, PAYNE quoted the CS a price of $14,000 for a half-kilogram and $27,000 for a whole kilogram.

11. On 5/17/2004, the Honorable Judge Ellen Huvelle, United States District Court for the District of Columbia, signed an Order authorizing DEA to intercept Edward PAYNE's cellular phone, (202)285-1384. During the wiretap, it became clear that Gary ROSS was Edward PAYNE's source of supply for cocaine. ROSS is a well-known cocaine trafficker in the Washington, DC area. Your Affiant spoke to FBI agents, who stated that ROSS has been supplying kilogram quantities of cocaine to other drug traffickers in Northeast, Washington, DC for years.

12. On 5/26/2004, Group 32 intercepted conversations which indicated that PAYNE and ROSS were meeting to conduct a drug transaction. At approximately 5:27 PM, PAYNE spoke to ROSS and indicated that he was "waitin' on you." Later in the conversation, ROSS asked if PAYNE wanted the "normal - you normally see me with...," meaning a quantity of cocaine. At approximately 7:49 PM, PAYNE told ROSS that he "just walked in here," meaning PAYNE's house. ROSS replied to give him "thirty minutes."

13. Based on the above, Group 32 established surveillance in front of PAYNE's house. At approximately 8:18 PM, ROSS called PAYNE and stated he was "out front." Simultaneously, SA McGrath observed a silver, Dodge minivan pull in front of PAYNE's residence. The vehicle was leased on 5/24/2004 to Gary ROSS, Jr. at 2037 2nd Street, NE, Washington, DC, another address used by ROSS. PAYNE exited his residence, walked to ROSS's vehicle, entered it, and engaged ROSS in conversation for approximately ten minutes. As discussed in paragraph 12, it appears that ROSS and PAYNE, pursuant to their discussions, met to conduct a drug deal or an illegal act affiliated with drug trafficking (e.g., money payment).

7

14. On 6/2/2004, CS conducted a fourth controlled purchase from PAYNE for 125 grams crack cocaine. The transaction occurred inside PAYNE's residence. Following the transaction, SA Griffin observed ROSS, operating a late model Mercedes Benz, pull in front of PAYNE's residence. PAYNE subsequently entered the vehicle. A short time later, PAYNE exited the vehicle, and SA McGrath observed ROSS depart the area. Your Affiant believes that ROSS supplied the cocaine for the transaction, and following the transaction, returned to collect the drug proceeds.

15. On 7/29/2004, Judge Huvelle signed Orders authorizing DEA to intercept wire communications from PAYNE's cell phone for an additional 30 days, and ROSS's cell phone for an initial 30 day period.

16. On 8/11/2004, Group 32 developed information that ROSS and an unidentified male known as "Fat Mike," later identified and known to your Affiant as Billy SIMON, were conducting a drug transaction. Group 32 intercepted numerous phone calls over ROSS's telephone which indicated that ROSS and SIMON were meeting in the area of Uhland Terrace, NE, Washington, DC.

17. Based on the above, Group 32 established surveillance in the area of the 100 block of Uhland Terrace, NE, Washington, DC. At approximately 2:25 PM, ROSS and SIMON were observed sitting in SIMON's vehicle, a green 2002 Cadillac Escalade bearing Maryland tag M185203, registered to Binson J. MONDESTIN. A short time later, the vehicle was observed departing the area with SIMON driving. A traffic stop was conducted in the 400 block of Rhode Island Ave., NE, Washington, DC. Billy J. SIMON was identified as the driver of the vehicle, and ROSS was in the passenger seat. Group 32 task force officers seized approximately 125 grams of cocaine from behind a false panel in the center console of the vehicle and a Glock 17 pistol from the

arm rest in the back seat. Additionally, approximately $3,500 was taken from ROSS's person. SIMON was subsequently "no-papered" by the U.S. Attorney's Office in Washington, DC.

18. During booking, SIMON gave an address of 2600 Queens Chapel Road, Mt. Ranier, Maryland. Subsequent to SIMON's arrest, SA McGrath again searched SIMON's vehicle, SA McGrath located numerous documents bearing Billy SIMON's name. Additionally, SA McGrath located mail, postmarked June 21, 2004, with SIMON's forwarding address of 501 Hungerford Drive, Apartment 250, Rockville, Maryland.

### CRIMINAL HISTORY

19. Edward PAYNE has an extensive criminal history. PAYNE has been arrested on at least five occasions, three of which occurred in Washington, DC: 1) on 8/13/1987, for violation of Uniform Controlled Substance Act; 2) On 2/12/1993, for Carrying a Pistol without a License; and 3) on 6/30/1994 for Possession with intent to distribute crack cocaine while armed and was convicted. PAYNE also has a drug conviction in Prince George's County from 1987, for which he was sentenced to 5 years, suspended, and 5 years probation.

20. Gary ROSS has been arrested on at least two occasions. ROSS was arrested on 4/14/2000 and 8/31/2000 in Washington, DC for a violation of the Uniform Controlled Substance Act and Possession with Intent to Distribute Cocaine, respectively.

21. Billy SIMON has been arrested numerous times for the distribution of narcotics. SIMON was first arrested on 1/6/1989 for distribution of cocaine. SIMON has an additional five arrests for distribution of drugs. Additionally, on 12/16/2001, SIMON was arrested for distribution and carrying a pistol without a license.

9

## ADDRESSES TO BE SEARCHED

22. Gary ROSS resides at 2322 Sun Valley Circle, Silver Spring, Maryland. During the wire intercepts, ROSS mentioned to another individual that ROSS lived near a fish restaurant called "Arthur's." In July 2004, surveillance agents located a car, which was then regularly driven by ROSS, parked in front of 2322 Sun Valley Circle, Silver Spring, Maryland. There is an Arthur Treacher's seafood restaurant located in a nearby strip mall. From July to the present, ROSS has been observed coming and going from this residence at various times of the day and night in a pattern consistent with this being ROSS's residence. The Mercedes Benz referenced in paragraph 14 above, has also been regularly seen parked in the area of 2322 Sun Valley Circle. The owner of the residence is Dana LIPSCOMB, who also owns a home at 2037 2nd Street, NE, Washington, D.C. As explained in paragraph 23, below, ROSS said that his mother's maiden name is LIPSCOMB. Further, in August 2004, ROSS was intercepted in numerous conversations with Jonathan Warren during which they discussed conducting a drug transaction. At one point, ROSS indicated that he was about to leave to meet Warren. At about the same time, surveillance agents observed ROSS exit 2322 Sun Valley Circle, enter a vehicle and then drive directly to a meeting with Jonathan Warren. Officers attempted to stop Warren after the meeting, but Warren was able to flee. Later that day, ROSS and Warren were intercepted in a conversation during which Warren told ROSS that he was able to flee from the police without having to "toss" the "thing" he got from ROSS.

23. Gary ROSS also frequents 2612 Kirkwood Place, Apartment 202, Hyattsville, Maryland. During the wiretap, ROSS conducted a series of phone conversations with individuals using the phone number (301) 484-2037, which is the telephone number subscribed to "Gary Ross"[1] at 2612

---

[1] Telephone records do not indicate if this is Gary Ross Jr. or Gary Ross Sr.

10

Kirkwood Place, Apartment 202, Hyattsville, Maryland, which appears to be the residence of ROSS's mother. The following are excerpts from a series of phone conversations linking ROSS to this residence. On 8/5/2004, ROSS's mother called him and asked ROSS if ROSS was coming back through so she can "lock up." On 8/7/2004, ROSS's mother called ROSS's cellular phone and told ROSS that she needs his parking pass. On 9/19/2004, ROSS called 1-800-252-8114 and spoke to a representative from VISA. ROSS told the VISA representative that he resides at 2612 Kirkwood Place, Apartment 202, Hyattsville, Maryland. ROSS stated that he had a household income of $95,000. ROSS also supplied a password for the account of Delilah "LIPSCOMB," which he said was his mother's maiden name. Futher, the Mercedes regularly driven by ROSS is registered to his father, Gary Ross, Sr. at this address. Gary ROSS also has a credit card account which is billed to him at this address.

24. Billy SIMON resides at 501 Hungerford Drive, Apartment 250, Rockville, Maryland. Pursuant to an arrest of SIMON, your Affiant performed an inventory search of a vehicle operated by SIMON which contained mail matter for SIMON at 501 Hungerford Drive, Apartment 250, Rockville, Maryland. SA McGrath queried public databases and, beginning in July 2004, Autotrak indicates SIMON uses this address as an address of record and also for his utilities.

25. Based on the foregoing information, there is probable cause to believe that the premises known as 2322 Sun Valley Circle, Silver Spring, Maryland 20906, 501 Hungerford Drive, Apartment 250, Rockville, Maryland 20850, and 2612 Kirkwood Place, Apartment 202, Hyattsville, Maryland 20782, contain property constituting evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1), and Title 18, United States Code, Sections 1956 and 1957, the commission of the above-described offenses, the fruits of the crime, property designed or intended

11

for use and which is and has been used as the means of committing the offense, and those items listed on Attachment A, which is incorporated by reference.

*Timothy D. McGrath, SA*
Timothy McGrath
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me the 27th day of October, 2004.

*ALLYN K. Pace*
ALLYN K. SCHULZE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MARYLAND